UNITED STATES DISTRICT COURT
DISTRICT OF MAINE

UNITED STATES OF AMERICA )
)    Crim. No. 1:21-mj-00062-JCN
v. )    18 U.S.C. §§ 371, 924(a)(1)(A)
)    and 922(a)(6)
JOSHUA LEWIS )
CRYSTAL POTTER )

## CRIMINAL COMPLAINT

I, Sean Sullivan, being duly sworn, state the following is true and correct to the best of my knowledge and belief:

### COUNT ONE
(Conspiracy to Violate Federal Firearms Laws)

THE CONSPIRACY AND ITS OBJECTS

1. Beginning on about September 16, 2020, and continuing until about September 17, 2020, in the District of Maine, the defendants,

**JOSHUA LEWIS**
**CRYSTAL POTTER**

knowingly and intentionally conspired with each other to commit offenses against the United States, specifically: (1) knowingly making false statements or representations with respect to information required to be kept by a federal firearms licensee in violation of Title 18, United States Code, Section 924(a)(1)(A); and (2) knowingly making a false oral or written statement, intended or likely to deceive a federal firearms licensee with the intent to deceive the federal firearms licensee, in violation of Title 18, United States Code, Section 922(a)(6).

1

## MANNER AND MEANS OF THE CONSPIRACY

2. It was part of the conspiracy that Crystal Potter, at the direction of Joshua Lewis, purchased a firearm from a federal firearms licensee in Maine intending to immediately turn the purchased firearm over to Joshua Lewis.

3. It was part of the conspiracy that Crystal Potter made false statements in connection with the acquisition of a firearm from a licensed dealer of firearms within the meaning of Chapter 44, Title 18, United States Code, which statements were intended and likely to deceive the licensed dealer of firearms, as to a fact material to the lawfulness of the sale of each of the respective firearm.

4. It was part of the conspiracy that Crystal Potter made false statements and representations in one of the forms that the licensed dealer of firearms was required to keep in connection with the sale of the firearm.

5. It was part of the conspiracy that Crystal Potter turned the firearm so obtained over to Joshua Lewis. Joshua Lewis provided financial compensation to Crystal Potter for engaging in the transaction.

## OVERT ACTS

6. During the course of the conspiracy, the following overt acts were committed in the manner described in paragraphs 2 through 5, above.

7. On September 17, 2020, Crystal Potter made a false statement in connection with the purchase of a Glock, Model 45GEN5, .9mm Pistol, Serial BLAZ424 ("the firearm") from the Gun Shop, LLC located in Augusta, Maine. Specifically, Crystal Potter answered "yes" to question 21(a) on ATF Form 4473

which asks "[A]re you the actual buyer/transferee of the firearm listed on this form?" In fact, Crystal Potter did not intend to keep the firearm for herself and intended to give the firearm purchased to Joshua Lewis immediately after the sale.

8. Crystal Potter gave the firearm to Joshua Lewis immediately after the sale.

9. Joshua Lewis had paid Crystal Potter $700 via the Cash App application in in exchange for purchasing the firearm.

All in violation of 18 U.S.C. § 371.

Dated: March 15, 2021

Special Agent Sean Sullivan, ATF

Sworn to telephonically and signed electronically in accordance with the requirements of Rule 4.1 of the Federal Rules of Criminal Procedure

Date: Mar 15 2021

City and state: Bangor, ME

Judge's signature

John C Nivison U.S. Magistrate Judge
Printed name and title

3

## AFFIDAVIT OF SEAN SULLIVAN

### Background

1. I am employed as a Special Agent with the Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF), United States Department of Justice, and have been so employed since 2014. I am currently assigned to a joint task force comprised of ATF agents and detectives from Southeastern Massachusetts. I have participated in numerous investigations focusing on Controlled Dangerous Substance ("CDS") trafficking, gangs, and illegal firearms. I have conducted covert surveillance of suspected CDS traffickers; interviewed numerous individuals involved in gangs and the CDS trafficking trade; participated in several Title III wiretap investigations as a monitor and member of surveillance teams; participated in the execution of numerous state and federal search and arrest warrants involving CDS traffickers and violent offenders; and participated in the seizure of numerous firearms and controlled dangerous substances.

2. I have written and/or participated in the execution of numerous state and federal search warrants, and have debriefed many defendants, informants, and witnesses with personal knowledge regarding firearms and narcotics trafficking and the operation of firearms and/or narcotics traffickers. I have also received training through my position as an ATF Special Agent involving firearms and narcotics trafficking. Among other things, this has familiarized me with: (1) the manner in which illegal guns are brought into Massachusetts and sold; (2) firearm and

1

narcotics traffickers' methods of operation, including their acquisition, transportation, storage, and transportation of both illegal guns and drugs; and (3) the widespread utilization of cellular telephones in the course of such activities.

3. I have personally participated in the investigation of Joshua Lewis and Crystal Potter. I am familiar with the facts and circumstances of this investigation based upon: (a) my personal knowledge and involvement in the investigation; (b) my discussions with fellow agents and officers who assisted in the investigation; (c) my review of internet searches; and (d) my experience and training as a criminal investigator.

4. I am submitting this affidavit in support of the issuance of a criminal complaint charging Joshua Lewis and Crystal Potter with conspiracy to violate federal firearms laws, in violation of 18 U.S.C. §§ 371, 922(a)(6) and 924(a)(1)(A).

Probable Cause

*Background Of Investigation*

5. The investigation began on or about October 13, 2020, when Sergeant Detective Gregory Pigeon of the Rockland, Massachusetts Police Department (RPD) contacted ATF Special Agent Brian Higgins and requested ATF's assistance determining the ownership history of a Glock, Model 45GEN5, .9mm Pistol, Serial BLAZ424 (the "Firearm"). Sergeant Detective Pigeon told SA Higgins that, two days earlier, an individual (hereinafter referred to as "cooperating witness" or

"CW") had turned the Firearm and approximately 14 rounds of loose ammunition into him.

6.  On October 20, 2020, SA Higgins received the results of an ATF Firearms Trace Summary, which revealed that an individual had initially purchased the Firearm on September 14, 2019, from A&G Shooting and Supply/A&G Shooting located 214 Center Road, Fairfield, Maine.

*First Interview Of CW On October 27, 2020*

7.  On October 27, 2020, Sergeant Detective Pigeon (RPD) and SA Higgins conducted a non-custodial interview of CW at the RPD. CW told investigators the following regarding the Firearm purchase:

   a.  A friend put CW in contact with an individual named Joshua Lewis who had a firearm for sale.

   b.  CW contacted Lewis via Facebook Messenger.

   c.  Lewis offered CW a Glock pistol for $600. Lewis "really piled it on" and wanted to sell the pistol.

   d.  Less than a week prior to turning the firearm into the RPD, CW travelled to what CW believed to be Lewis' apartment or a business on Grove Street in Middleboro, MA. The building looked like an office building or a rooming house.

   e.  CW met with Lewis, who CW described as a white male in his twenties or thirties. The Firearm was on a couch in a box when CW arrived.

3

f.  Lewis assembled the Firearm and gave CW a tutorial of the pistol. Lewis made a reference to the Firearm's serial number and eluded to the fact it was not connected to a person. SA Higgins understood this to mean that Lewis was indicating that the gun was not registered or otherwise formally associated with anyone.

g.  CW paid Lewis $600 via Cash App (a mobile payment service) in exchange for the Firearm, magazines for the pistol, and approximately 14 rounds of ammunition.

*Ownership History Of The Firearm & False ATF Form 4473*

8.  On November 13, 2020, ATF SA Higgins and I traveled to the Gun Shop, LLC located in Augusta, Maine after learning from the first purchaser of the firearm that he had sold it to this Federal Firearms Licensee (FFL) within the last year. An employee of The Gun Shop, LLC told me, among other things, that they had received the firearm from the first purchaser on January 17, 2020.

9.  The Gun Shop, LLC next provided me ATF Form 4473, dated September 17, 2020, which revealed Crystal Potter purchased the Firearm and some Magtech 9mm Luger 115 Grain ammunition from them in one transaction.

10.  ATF Form 4473 is a form that is required to be completed when a person proposes to purchase a firearm from a FFL holder, such as the Gun Shop. As noted in a "WARNING" at the top of the form, the information provided by the proposed purchaser on the form is "used to determine whether [the person is]

4

prohibited by Federal or State law from receiving a firearm." The form must be signed by the proposed purchaser under a certification that the information in it is "true, correct, and complete." That information includes the person's name, address, and date of birth, among other identification information, as well information about the firearm(s) being purchased. The form also requires the person to answer a number of questions, including the question "Are you the actual transferee/buyer of the firearm(s) listed on this form…?" The form goes on to state, in bold letters, that "**You are not the actual transferee/buyer if you are acquiring the firearm(s) on behalf of another person.**" This question is listed as item 21(a) on the form.

11.  On the ATF Form 4473 completed by Potter for the purchase of the Firearm and ammunition discussed herein, Potter checked "Yes" for question 21(a). In other words, Potter represented that she was the actual buyer and that she was not buying the Firearm for another person.

*Interview Of Crystal Potter On November 13, 2020*

12.  On November 13, 2020, Agent Higgins and I made contact with Potter at her boyfriend's residence in Augusta, Maine. Agent Higgins told Potter (1) she was not in custody; (2) she was not going to be arrested that day; and (3) the interview was voluntary and she could leave at any time. Potter agreed to the interview being conducted in my government owned vehicle.

13. At the outset of the interview, Potter was hesitant to provide information relating to the identity of Joshua Lewis. Eventually, however, Potter provided the following information:

    a. Potter had purchased the Firearm and ammunition at the direction of Joshua Lewis.

    b. Lewis had sent her a message via Facebook and asked her to purchase a firearm on his behalf.

    c. Lewis also asked her to buy ammunition for him.

    d. Prior to purchasing the Firearm on behalf of Lewis, Lewis sent Potter money via Cash App. Lewis sent the money to her on September 16, 2020, the day before she bought the Firearm on Lewis' behalf.

    e. On September 17, 2020, Lewis came to her residence in Augusta, Maine. Lewis arrived in a black vehicle and was accompanied by a white female.

    f. Lewis and the female came into Potter's apartment briefly before they gave her a ride to the gun store to purchase the Firearm on behalf of Lewis.

    g. Lewis and the female remained in the vehicle while she purchased the Firearm.

    h. After purchasing the Firearm, Potter returned to the vehicle and gave Lewis the bag containing the Firearm, ammunition, and possibly the receipt generated from the purchase.

    i. Lewis and the female next dropped Potter off at her residence.

j.  Potter believes Lewis resides in Middleboro, Massachusetts based on his Facebook page, which she showed to Agent Sullivan and me.

*Interview Of Joshua Lewis On January 30, 2021*

14. On January 30, 2021, Sergeant Detective Pigeon and SA Higgins travelled to the Target Location and made contact with Lewis. They identified themselves to Lewis and advised him they would like to speak with him relative to an ongoing investigation.

15. SA Higgins asked Lewis if he would be willing to speak with investigators in their government owned vehicle because there were a few dogs present within his residence. Lewis agreed to speak with investigators, put on footwear, and took physical possession of his cellular telephone prior to exiting the residence.

16. While walking toward the vehicle, Lewis asked if he was being arrested. SA Higgins advised Lewis that (i) he was not being arrested, (ii) he was not in custody, (iii) speaking with investigators was voluntary, and (iv) he could leave at any time. They all then got into the vehicle -- Lewis sat in the front passenger seat, SA Higgins sat in the front driver's seat, and Sergeant Detective Pigeon sat in the rear seat behind Lewis. Lewis then reported the following:

a.  When SA Higgins asked Lewis if he knew why investigators wanted to speak with him, Lewis said, "Yes, I think it is about the gun I bought in Maine."

b. Shortly after becoming Facebook friends with a female from Augusta, Maine, Lewis asked her if she would purchase a small compact handgun on his behalf. Lewis could not recall the female's name but described her as a white female, medium build, brownish hair and wore glasses.

c. Lewis communicated with her by utilizing the Facebook messenger application via his cellular telephone. Lewis denied having a telephone number for this female and believed she has since blocked him on Facebook.

d. Lewis initially told SA Higgins that he paid his female Facebook friend $500 to $600 cash for a pistol and ammunition but that he brought $700 to Maine with him. Lewis later changed his story and told SA Higgins he had actually sent the female $700 via the Cash App application via his cellular telephone prior to the purchase of the pistol.

e. The female made a $100 profit for purchasing the pistol on his behalf.

f. In September or October 2020, Lewis travelled to Augusta, Maine with his then girlfriend to purchase the pistol.

g. Lewis and his girlfriend picked up his female Facebook friend at her residence in August, Maine and they all drove from her residence to the Gun Shop or Gun Depot also in Augusta, Maine.

h. The female next entered the gun store and returned a short time later and handed him a bag. Inside the bag was a Glock, Model 45, .9mm pistol with three 17-round magazines inside the gun box and two boxes of .9mm ammunition

8

for the pistol. (Lewis' description of these events is consistent with the records described above reflecting that Crystal Potter purchased a Glock, Model 45GEN5, .9mm Pistol, Serial BLAZ424—the Firearm—from the Gun Shop, LLC located in Augusta, Maine, on September 17, 2020).

    i.    Lewis, his girlfriend and his female Facebook friend drove from the gun store directly back to his friend's residence.

    j.    Lewis and his girlfriend drove from Augusta, Maine directly to his home in Massachusetts because he did not want to be driving around with the pistol in his possession.

    k.    Lewis initially purchased the pistol for protection. He subsequently realized, however, that it was a bad idea because he did not have a Massachusetts license to carry firearms. Lewis was also concerned about the fact that the pistol's magazines appeared to be high capacity. Lewis believed the pistol's magazines had the capacity to hold 17 rounds of ammunition each.

    l.    A friend was the "middle-man" and facilitated the sale of his Glock pistol to another individual he knew as "Joe." Prior to the sale of his pistol, he communicated with Joe via Facebook messenger application.

    m.    In late September or early October 2020, Lewis directed Joe to his residence for the purpose of selling his Glock pistol to him. When Joe arrived at his residence, Lewis brought him into his bedroom to conduct the transaction.

    n.    Prior to Lewis' sale of his Glock pistol, Joe asked for instructions on how to load it and take the pistol apart. Lewis provided Joe "a little safety class" before selling him his pistol and ammunition.

    o.    Lewis sold his Glock pistol and ammunition to Joe for $600, which was transferred to him by Joe via the Cash App application.

    17.    Lewis and SA Higgins then turned to discussing Lewis' cellular telephone, which was an iPhone 7, telephone (339) 832-9592. SA Higgins read Lewis a *Consent to Search Handheld Devices and Computer/Electronic Equipment* and asked him if he would provide consent to conduct a forensic examination of his cellular telephone without a warrant. After reviewing the form, Lewis provided consent by signing the form. Additionally, Lewis provided SA Higgins the passcode to the phone.

*Review Of Joshua Lewis' Cellular Telephone*

    18.    On February 1, 2021, SA Higgins conducted a preliminary review of the contents of Joshua Lewis' iPhone 7. SA Higgins discovered, among other things, the following:

    a.    During a text message conversation on September 18, 2020, Lewis at 12:05:28 AM texted a photograph of a box of Maxx Tech 9mm ammunition.

    b.    During the same text message conversation at 12:09:15 AM Lewis texted a photograph of what appears to be the bottom right hand corner of a receipt. Lewis then texted "That receipt is for everything I got today."

19. SA Higgins reviewed all documents generated by the Gun Shop that are associated with the purchase of the Firearm on September 17, 2020, by Crystal Potter, including a receipt bearing No. 11284. The receipt listed dollar amounts that match the dollar amounts on the receipt in the photograph that Lewis texted. Receipt No. 11284 also reflects the purchase of 1 "Maxx 9mm," which is consistent with the photograph of a box of Maxx Tech 9mm ammunition Lewis texted.

20. On February 10, 2021, as SA Higgins continued to review the contents of Joshua Lewis' iPhone 7, SA Higgins discovered photographs of the following:

a. A photograph of what appears to be a Glock semi-automatic pistol. It appears the serial number on the side of the pistol is BLAZ424, which is the serial number assigned to the Glock pistol—the Firearm—that initiated this investigation. The top of the photograph displayed "October 4, 2020" and "11:13 AM."

21. On February 17, 2021, during a further review of the contents of Joshua Lewis' iPhone 7, SA Higgins took note of the following text message conversation that occurred on November 13, 2020 between Joshua Lewis and Crystal Lynn Potter. That same day, investigators had tried to reach Potter, but instead reached only Potter's mother. The mother told investigators that Potter was not home, but that she planned to call Potter and alert her that investigators were looking to speak with her. The below text message exchange between Lewis

11

and Potter appears to have occurred after investigators made contact with the mother but before investigators interviewed Potter.

    a.    Potter at 11:27:58 AM texted "Again. I'm nervous. Sorry if I'm going ham for nothing." In response, Lewis at 11:29:47 AM texted "Lmao damn. And no I haven't gotten caught or anything with the gun. It's actually in better hands now to cause someone has it in their safe like towns over. So it's not even in anyone's hands right now. But delete all our messages and play dumb if they say anything about it. Random af but yeah. I'd just keep dodging them lol."

    b.    Potter at 11:31:11 AM texted "Alright I just had to make sure. I've never had cops looking for me and it just made me a little nervous. I appreciate you!!! And sorry if I've caused alarm at all. Just wanted to be sure. Thank you ♥." In response, Lewis at 11:31:28 AM texted "Also. There was a search done on it. It's not registered to anyone. So for it to find it's way back to you" and at 11:32:22 AM "I forget what they call your state but a handgun is practically a tool."

    c.    Potter at 11:32:32 AM texted "What does that mean haha but alright either way. I appreciate it. Just makes me nervous cuz I've never been in trouble. I guess they told my mum I wasnt in trouble but wanted to talk."

    d.    Lewis at 11:32:58 AM texted "Lmao they are gonna all tell you that you're not in trouble" and at 11:33:26 AM "Remember. Don't say too much. Know your rights. Answer only what they ask nothing more and if they aren't detaining you. Leave after a few questions". Potter in response at 11:33:26 AM "Right haha."

12

22. On or about February 5, 2021, Lewis' iPhone 7 was returned to him.

## Conclusion

23. I respectfully request that the Court issue a criminal complaint charging Joshua Lewis and Crystal Potter with conspiracy to violate federal firearms laws, in violation of 18 U.S.C. §§ 371, 922(a)(6) and 924(a)(1)(A).

Dated: March 15, 2021

_____
Sean Sullivan
Special Agent
Bureau of Alcohol, Tobacco, Firearms & Explosives

Sworn to telephonically and signed electronically in accordance with the requirements of Rule 4.1 of the Federal Rules of Criminal Procedure

Date: Mar 15 2021

City and state: Bangor, ME

_____
Judge's signature
John C. Nivison U.S. Magistrate Judge
Printed name and title

**Complaint Synopsis**

| | |
|---|---|
| **Name:** | Joshua Lewis |
| **Address:** (City & State Only) | Middleboro, Massachusetts |
| **Year of Birth/Age:** | 1989, 31 |
| **Violations:** | Conspiracy to violate federal firearms laws. 18 U.S.C. §§ 371, 922(a)(6) and 924(a)(1)(A). |
| **Penalties:** | Imprisonment of not more than five years; fine not to exceed two hundred fifty thousand dollars ($250,000); or both. 18 U.S.C. §§ 371 and 3571(b)(3).<br><br>Class D felony pursuant to 18 U.S.C. § 3559(a)(4). |
| **Supervised Release:** | Not more than three years. 18 U.S.C. § 3583(b)(2). |
| **Maximum Term of Imprisonment for Violation of Supervised Release:** | Not more than two years. 18 U.S.C. § 3583(e)(3). |
| **Maximum Add'l Term of Supervised Release for Violation of Supervised Release:** | Three years less any term of imprisonment imposed upon revocation of supervised release. 18 U.S.C. §3583(h). |
| **Defendant's Attorney:** | Pending Appointment/Retention |
| **Primary Investigative Agency and Case Agent Name:** | Bureau of Alcohol, Tobacco, Firearms and Explosives Special Agent Sean Sullivan |
| **Detention Status:** | Not Detained |
| **Foreign National:** | No |
| **Foreign Consular Notification Provided:** | N/A |
| **County:** | Kennebec |
| **AUSA:** | Michael J. Conley |

| | |
|---|---|
| **Guidelines apply?   Y/N** | Yes |
| **Victim Case:** | No |
| **Corporate Victims Owed Restitution:** | N/A |
| **Assessments:** | $100 |